PARSON MFG. CO. v. COE.

(Circuit Court, D. New Jersey. May 23, 1910.)

1. PATENTS (§ 328*)—INFRINGEMENT—STEAM BLOWER.

The Parson patent, No. 573,480, for a steam blower, claim 1, in view of the disclosures of the prior art and the proceedings in the Patent Office, is limited to a construction in which the superheater is located in an inclosed brick incased chamber arranged above the grate of the furnace and adjacent to the side wall of the furnace. As so construed, *held* not infringed.

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—SMOKE-CONSUMING FURNACE.

The Parson reissue patent, No. 12,072 (original No. 681,457), for a smoke-consuming furnace, claim 2 is void as for a mere aggregation, and not a combination, of elements. Claim 1, if conceded validity, *held* not infringed.

3. PATENTS (§ 328*)—INVENTION—GRATE BAR.

The Parson patent, No. 702,585, for a grate bar, *held* void for anticipation and lack of invention in view of the prior art.

In Equity. Suit by the Parson Manufacturing Company against Charles T. Coe, trading as the New York Grate Bar Company. Decree for defendant.

S. D. Oliphant, Jr. (Steuart & Steuart, of counsel), for complainant. Charles C. Gill, for defendant.

CROSS, District Judge. There are three patents involved in this controversy which the bill of complaint alleges are capable of conjoint use and have been conjointly used. They were all issued to one Henry E. Parson and assigned to the complainant. Of these patents the first which will be considered is No. 573,480, dated December 22, 1896, for a steam blower. Of its two claims the first only is involved.

"1. The combination of a steam blower, an elongated brick-incased chamber arranged above the grate of the furnace, adjacent to the side wall of the furnace, a superheater located in said chamber, a valved steam-supply pipe for connecting the superheater with the steam blower, and a steam pipe connecting the superheater with the boiler, substantially as set forth."

Among the defenses thereto set up by the answer are invalidity and noninfringement. The question of its validity need not be considered, since the conclusion has been reached that, to sustain the validity of the patent, the claim in question must be narrowly construed, and, thus construed, the defendant is not guilty of infringement.

The file-wrapper is in evidence and its inspection discloses that the application for the patent as originally made contained three claims, all of which were rejected by the examiner, who cited several patents in the prior art as anticipations. The applicant accepted the judgment of the examiner, and thereupon filed amended claims which were allowed, and appear in the patent under consideration. Among the claims disallowed was the following:

"3. The combination of a steam blower, composed of an exterior casing and a nozzle-frame having inwardly-extending nozzles, a superheater located in a brick-incased chamber at the interior of the furnace, a valved steam supply

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

pipe, for connecting the superheater with the nozzle-frame and a steam pipe connecting the superheater with the boiler, substantially as set forth."

The patentee in submitting the amended claims, wrote the commissioner as follows: "In view of the references we have taken out the specific claims to the construction of the steam blower and rely on the construction of the superheater for obtaining the allowance of the application"—and it was upon this element of the combination that the applicant's case was rested. Viewing the case as thus presented, it will appear that "a superheater located in a brick-incased chamber at the interior of the furnace" was old, and was conceded to be so by the patentee when he eliminated it from his claim after objection by the examiner, and substituted therefor the following language:

"A brick-incased chamber arranged above the grate of the furnace, adjacent to the side wall of the furnace, a superheater located in said chamber."

From the above quotations it appears that the patentee was obliged to, and did, surrender the idea of locating his brick-incased chamber, containing the superheater at will, in any part of the interior of the furnace, and chose in lieu thereof to locate it in a specifically defined place in the interior of the furnace; that is to say, above the grate and adjacent to the side wall of the furnace. These involuntary concessions induced the allowance of the patent, and the complainant cannot now be heard to minimize or disregard them. The complainant's expert contends, however, that the brick-incased chamber of the patent may be dispensed with and the superheater pipe imbedded in the wall of the furnace. This insistment, however, is untenable. In the first place, it omits altogether the element of a brick-incased chamber within the meaning of the claim, and, again, a superheater thus located would not be adjacent to, but within, the side wall of the furnace, nor would it be above the grate bar of the furnace, which bar is of necessity within and inclosed by the walls of the furnace. Furthermore, it was old in the art to locate the superheater in any of the different inclosing walls of the furnace. The patent to Miller No. 418,955, January 7, 1890, that to Metz, No. 498,959, June 6, 1893, and that to Wheelen No. 341,196, May 4, 1886, show superheaters located in the front end wall of the furnace. Tinkhan No. 460,189, September 29, 1891, shows a superheater protected in the rear end wall. Farr, No. 303,963, August 19, 1884, shows a superheater located in the bridge wall. Tinkhan, No. 497,392, May 16, 1893, Tinkhan No. 534,297, February 19, 1895, and Elliott, 248,925, November 1, 1881, show the superheater in the side wall or walls, and Livingston 399,541, March 12, 1889, located them, quoting from the specification, "On the preferred part, the part preferred being on each side of the door at the front inside." Moreover, the prior art shows, not only that the superheater pipes were previously imbedded in the walls of the furnace, but that they were thus imbedded for the very purpose, as claimed by the complainant, of protecting them from injury by the intense heat of the furnace fire. For instance, Tinkhan, in No. 534,297, says in speaking of figure 3 of that patent:

"I have shown a portion of the brickwork as omitted, but in practice I prefer to fill in the space between the pipes with brick or other refractory mate-

rial so as to completely imbed the superheating coils and the steam and air conducting pipes and by thus imbedding said pipes they are effectively protected from being burned out."

The above and other patents might be cited which show the superheater located in well-nigh every conceivable position in the side and end walls of the furnace. It is obvious, therefore, that Mr. Parson in procuring the patent in question was, in order to escape the revelations of the prior art, compelled to select the position which he did. So far as he is concerned, practically every other location was open to general use. The location of the brick-incased chamber inclosing the superheater in the position chosen by the patentee was, as has been shown, the only novel feature in his combination, and the one upon which he chose to stand. Under such circumstances, he is not entitled to any general application of the doctrine of equivalents. In view of the disclosures of the prior art and the limitations imposed upon the claim in question, and keeping in mind that by the term of the claim the superheater of the patent in suit was required to be located in an inclosed brick-incased chamber arranged above the grate of the furnace and adjacent to the side wall of the furnace, it follows that a superheater, which like that of the defendant is not inclosed in a brick-incased chamber, is not above the grate of the furnace, and is not adjacent to the side wall of the furnace, is not within the claim.

An expert who testified for the complainant, but without any examination of the prior art or of the file-wrapper of the patent in suit, calls the construction of the defendant a brick-incased chamber notwithstanding it is a cast-iron box set in the rear end wall of the furnace with its front side or face flush with the wall and directly exposed to the flames. It is a difficult proposition, however, even for an expert to prove that that which is only incased on three sides is incased on four, or that anything can properly be called incased which is not incased. But, assuming that it is a brick-incased chamber, still it is not located above the grate or adjacent to the side wall. That the defendant's superheater may be laterally above the grate and consequently at a higher elevation than the grate does not bring it within the terms of the claim. "Above the grate," as used in the claim, and illustrated by the drawings and specifications, means over the grate; that is, within the area which would be bounded by the exterior lines of the grate if they were upwardly projected. Or, to put it in another way, the claim requires the brick-incased chamber holding the superheater to be located vertically above the grate. To permit it to be placed elsewhere would strain simple language out of its ordinary meaning.

Great stress is laid upon the durability and utility of the complainant's brick-incased construction. That, however, is a question which the defendant may properly determine for himself. If he adopts a less effective or durable method, he must suffer the consequences. In saying this it must not be taken for granted, however, that the exposed surface of the cast-iron box inclosing defendant's superheater is at all lacking in durability or efficiency. The evidence is strongly to the contrary. Since, therefore, there is no evidence of

infringement by the defendant of the patent in question, the bill of complaint as to it must be dismissed.

Patent No. 12,072, reissue dated January 6, 1903, is for a smoke-consuming furnace. The first and second claims are involved, and read as follows:

"1. The combination with a closed combustion-chamber and ash-pit, of a grate, a banking platform having air-channels, a bridge-wall having air-channels which communicate with the air-channels of the banking platform and receive air from the region of the ash-pit, the channels of the bridge-wall delivering air to the fire-chamber, a hot-air-blast pipe arranged within the fire-chamber and heated thereby and delivering hot air under pressure to the ash-pit, a blower delivering air under pressure to the hot-air-blast pipe, and means for dividing the blast between the ash-pit and the fire-chamber.

"2. The combination with a closed combustion-chamber and ash-pit, of a grate, a banking platform having air-channels, a bridge-wall having air-channels which communicate with the channels of the banking platform and receive air from the region of the ash-pit, the channels of the bridge-wall delivering air to the fire-chamber, a hot-air-blast pipe arranged within the fire-chamber, and heated thereby and delivering hot air under pressure to the ash-pit, a blower delivering air under pressure to the hot-air-blast pipe, means controlled by the boiler-pressure for automatically regulating the force of the said blower, and means for dividing the blast between the ash-pit and the fire-chamber."

The original patent, No. 681,457, was dated August 27, 1901. The application for reissue was filed March 21, 1902. In his verified application for reissue Parson says:

"First. Claim 1 of the original patent includes as essential elements a banking platform and a fire bridge, hot air blast extending through the rear wall of the furnace and the base of the fire bridge and banking platform into the ash-pit, a steam blower in said hot-air-blast pipe, heating flues in the banking platform and fire bridge and a damper for opening or closing said hot air supply opening in the blast pipe. The automatic regulation of the forced draft both below and above the grate is in no way dependent upon the use of the banking platform and fire bridge. The blower by which the forced draft is operated might be a steam blower or of some other pattern. The outlet openings for the forced draft delivered above the grate might be in the side rather than in the top of the fire bridge, and the whole structure might be operated without the use of a damper for opening or closing the hot air supply opening in the blast pipe.

"Second. Claim 2 of the original patent contains as essential elements a banking platform and fire bridge adjacent to said grate, a hot-air-blast pipe extending through the rear wall of the furnace and through the base of the banking platform and fire bridge into the ash-pit, a steam blower at the rear end of the hot-air-blast pipe, a damper in the chimney of the furnace, flues in the banking platform and fire bridge, outlet openings in the top of the fire bridge, a damper in said supply opening of the blast-pipe, and means for opening or closing said damper from the outside of the furnace.

"The same remarks made with reference to claim 1 apply to claim 2. Many of these elements are unnecessary to a complete utilization of the real invention of this case."

The original patent contained two claims. The application for a reissue contained four claims which it was desired should be substituted for the claims of the original patent. Claims 1 and 2 applied for in reissue were rejected by the examiner, who cited several patents as anticipating them. The remaining two claims were allowed, and became claims 4 and 5 as the patent now stands. The applicant acquiesced in the decision of the examiner in rejecting the claims just re-

ferred to, and thereupon presented for his consideration three other claims which became 1, 2, and 3 of patent as reissued. By comparing the rejected claims in reissue with 1 and 2 of the patent as allowed, it is apparent that Parson was obliged to reinsert in claims 1 and 2 the elements of the banking platform and bridge-wall, concerning which the applicant in his sworn affidavit upon which his reissue patent was granted says:

"The automatic regulation of the forced draft both below and above the grate is in no way dependent upon the use of the banking platform and fire bridge."

This admission apparently invalidates claim 2 in reissue. It shows conclusively that that claim calls for an aggregation, and not a combination of elements. But, irrespective of his admission, it is obvious that there is no co-ordination between the automatic regulation of the forced draft and the banking platform, which constitute two of the elements of the claims. The banking platform either with or without such automatic regulation would perform its function in the same way, and the same is true of the automatic regulator. But, if this were not so, the patentee is estopped by the solemn admission contained in his application for reissue from asserting the contrary. Having asserted that the elements referred to were not dependent one upon the other, he cannot now be heard to claim otherwise. Claim 1 in suit is like 2, except that it leaves out the element of automatic regulation. It is difficult to see how this claim can avoid being considered as an aggregation. A banking platform as abundantly appears is used simply to facilitate the cleaning of the fires. At such a time the furnace door must of necessity be open, which cuts off the blower, and renders it inoperative for the time being. The functions of the banking platform and of the blower are distinct and separate. When one is used, the other is not. Their functions are not interdependent. I do not deem it necessary, however, to decide that this claim is invalid, for, in view of the prior art, it must be strictly construed, and thus construed the defendant has not infringed it. Turning to the consideration of but a small portion of the prior art, it will be found that all of the elements of the claim, except the banking platform, having air-channels in combination with the bridge-wall which also has air-channels which communicate with the air-channels of the banking platform, are old. The use of fire bridges with air passages therein for the purpose of heating the air and aiding a more thorough consumption of the smoke and gases arising from combustion is very old in the art. The British patent to Stanley, of 1867, shows not only a superheater, but almost all—indeed all of the elements of the patent in suit in combination, with the exception of a hollow fire bridge and a banking platform with its air-passages. He also suggests the placing of the superheater in the roof or over, or by the side of the fire or at the bridge, or other part where there is great heat. The British patent to Parke (1820) shows the bridge with an air-passage therein, but it did not show any means for supplying a forced draft which was not then invented. The patent to Sutcliffe, 1888, also substantially meets the elements of claim 1 with the exception of the banking plat-

form with its air-channels. One of the drawings also shows the bridge wall beveled, a matter concerning which reference will be made later. As to the automatic regulating device of the patent in suit, that was anticipated by Champion, No. 393,357, of 1888. In the specification of his patent he says:

"It will, of course, be understood that the particular claim of the automatic regulator is immaterial. All that is essential is that the regulating device be operated by steam under boiler pressure, and that the movable part of the device be connected in some suitable way with the valves controlling the supply of steam and air to the injector."

And he further says: "My present invention has for its object to make the construction self-regulating." The construction referred to was that described and covered by a patent No. 362,935, issued to him in 1887, for a steam blower. Patent No. 413,921, of 1889, to Blanchard, is also for an automatic apparatus for supplying steam and air to furnaces. Patent No. 574,188, 1896, to Burke, also covers an automatic blowing apparatus. Notwithstanding Champion's later patent, Parson makes his automatic regulator the most important feature of the patent in suit. Patent No. 532,105 to Sieben and Wagner, 1895, substantially embraces all of the elements of claim 1, with the exception of the banking platform with its air-channels. I have included in the above references several patents showing automatic regulation, notwithstanding the doubt expressed as to the validity of that claim for reasons already given. The prior art cannot be studied without arriving at the conclusion that the patent under consideration, if sustained, must be confined to the specific combination therein set forth. It was because its claim introduced the banking platform and a bridge wall having intercommunicating air-channels that it was allowed. With these elements omitted, the complainant's device was anticipated by several patents. Construed from this standpoint, the patent has not been infringed. Infringement is alleged because the defendant, having become a successful bidder after public competition, entered into a contract which is known in the case as the Ridgewood Pumping Station contract. One of its provisions relating to alterations in certain furnaces was as follows:

"The bridge walls must be rebuilt so as to give a supply of hot air over the fires, said supply to be regulated by damper, and, where possible, bridge wall must be made with a cleaning shelf."

Certain drawings accompanied the contract and showed what is called "cleaning shelf." The defendant's contract it will be noticed did not require him unconditionally to construct a cleaning shelf, but where possible the bridge wall was to be made with a cleaning shelf, and he swears that in its performance he only beveled off the old bridge wall. But beveled bridge walls with underlying air-passages were old in the art, and the construction contemplated would not, if carried out, have constituted an infringement. As a matter of fact, however, in making the attempt to bevel the bridge wall he found that because of its thinness it was impossible to complete the contemplated construction; hence the project was abandoned, and the wall restored to its former condition. There is nothing in the contract, specifica-

tions, or drawings to show that he intended to build the banking platform called for by the Parson patent. The defendant's testimony which is directly to the contrary is the only evidence in the case upon the point. Moreover, the contract, as appears upon its face, was contingent. A cleaning shelf was only to be built in case it were possible by the use of the old bridge wall. While threatened infringement may undoubtedly be enjoined, the evidence in this case shows but a vague and conditional threat, if threat it be, which is best interpreted by what the defendant actually did or rather tried to do before he found out the impossible character of his undertaking. He merely beveled off the bridge wall, and, if that made a cleaning shelf, it was old in the art and only that which he had a perfect right to do, as will appear by examining the following patents: No. 418,955 to Miller, January 7, 1890; No. 421,990 to Tobin, February 25, 1890; No. 640,726, to Wilder, January 2, 1900; No. 498,959 to Metz, June 6, 1893. The burden of proof to show infringement rests upon the complainant, but there is not a word of testimony to show that the defendant ever contemplated, much less threatened to construct, a bridge wall and banking platform with their intercommunicating air-channels as called for by the patent in suit. In order to show infringement, however, complainant's expert, who as to this patent also admitted that he had not examined the prior art or the file-wrapper, testified in this connection that the combination of claim 1 consisted of the following elements:

"1st. A closed combustion chamber and ash-pit.
"2d. A grate.
"3d. A bridge wall in which is formed air-channels on which is formed a banking platform.
"4th. A hot-air-blast pipe.
"5th. A blower.
"6th. Means for dividing the blast."

He was therefore compelled, in order to make out any pretense of infringement on the part of the defendant, to eliminate an element of the complainant's patent. The claims, both of them, demand a banking platform having air-channels, and a bridge wall having air-channels, which communicate with the air-channels of the banking platform, and receive air from the region of the ash-pit. Unquestionably that language sets forth two elements in combination, which elements the expert, in order to support his testimony relating to infringement, was compelled to combine into one to read as follows: "A bridge wall in which is found air-channels and on which is formed a banking platform." It requires no argument to show that his construction is absolutely untenable. It follows that, even if both of the claims are valid, infringement by the defendant has not been shown. As to this patent therefore, the bill will also be dismissed.

But one other patent remains for consideration. It is No. 702,585, dated June 17, 1902. Speaking of this invention, the patentee says:

"This invention relates to an improved grate-bar of that type which is provided with conical perforations extending through the bar and which are used for burning coal dust or small-size fuel with artificial draft, the grate-bar being so improved that increased strength is imparted to the same, warping prevented, and a more reliable support for and interlocking of the grate-bars

obtained; and the invention consists of a grate-bar provided with longitudinal rows of tapering perforations arranged in staggered position relatively to one another and a longitudinal rib of serpentine shape integral with said bar at its under side, the undulations of said rib extending in the spaces between and tangentially to the perforations of the central group of longitudinal rows of perforations of the bar; and the invention consists, further, in the combination of two adjacent grate-bars provided with alternate interlocking tongues and recesses and intermediate straight connecting portions between said tongues and recesses, said tongues being provided with corrugations at their edges and a tubular transverse supporting-bar for the adjacent ends of the grate-bars."

The patent has two claims, but the complainant relies only upon the first, which is as follows:

"1. A grate-bar provided with longitudinal rows of tapering perforations arranged in staggered position relatively to one another, and a longitudinal rib of serpentine shape integral with said bar at its under side, the undulations of said rib extending in the spaces between and tangentially to the perforations of the central group of longitudinal rows of perforations of the bar, substantially as set forth."

The file-wrapper is in evidence, and discloses that after numerous changes and modifications made by the patentee in an effort to obviate objections and avoid citations made by the examiner a patent was finally refused. An appeal was thereupon taken to the examiner in chief, who subsequently allowed the patent.

Several patents were cited by the examiner as anticipations which destroyed any possible claim of invention. Among the patents in the prior art there is one to Scofield, No. 54,415, granted in 1866, in the specifications of which it is said:

"The nature of said invention consists in a grate-bar formed with a rib on its under surface that is corrugated longitudinally with vertical or nearly vertical flexures, so that the under, or bottom edge of the rib forms a corrugated or waved line as seen in figure 2."

The rib was formed thus for the purpose of avoiding the warping and bending of the grate-bar, which, however, in this patent does not seem to have been perforated. Perforations in grate-bars, however, were old, probably as old as the use of stoves or furnaces for burning coal or other like material; indeed, the Parks British Patent of 1820 shows them of the form of the Parson grate-bar. Did it require invention to take this corrugated or undulating rib of Scofield and place it as it had been placed before on the under side of a grate-bar, being careful only to avoid stopping up the perforations of the grate-bar? The patent to Miller of 1885 shows a grate-bar with staggered perforations; the perforations being of tapering or conical form like those of Parson. Miller, however, expressly says that the shape of these perforations was old and disclaimed any invention thereof. The Miller bars also show supporting ribs. A patent to Hess, No. 343,370, of 1886, in Fig. 3 also shows perforations of a conical shape. Patent No. 474,116, 1892, to Duncan, shows a perforated grate-bar in which the perforations are tapered and of staggered arrangement in longitudinal rows. Duncan, speaking of his invention, says:

"My present invention has for its object to provide an improved form of grate-bar that shall be simple, cheap, and durable in construction, that shall permit a uniform and thorough combustion of the fuel, whether this fuel be

coal, wood, coal-slack, or sawdust, and that can be readily cleaned, and which without unnecessary weight of material shall effectively resist all tendency to warp under the intense heat to which such bars are subjected."

Laying aside for the moment the other patents referred to, this of Duncan seems to embody the alleged invention of Parson, as shown and claimed by him. It shows staggered longitudinal rows of perforations of a tapering or conical form with an undulated rib fitted in between the rows of perforations. Whether the rib crosses the grate-bar in exactly the same position and manner in which that of Parson crosses it is immaterial. That is a matter of detail. Any mechanic of ordinary intelligence skilled in the art would have taken care that the rib in crossing the grate-bar diagonally did not obstruct the holes in the grate. It would scarcely be sensible after making holes to stop them up. Again, no invention can be found in increasing or lessening the number of the rows of perforations or in the number or arrangement of such rows or perforations, or in so adjusting the rib as to pass between and around such perforations. In short, there was no invention in placing the old undulated bar of Scofield or Duncan on the under side of a perforated grate-bar, and avoiding the perforations of the bar in so doing. The fact that the claim in question calls for a rib extending in the spaces between and tangentially to the perforations of the central group of longitudinal rows of perforations of the grate-bar adds nothing by way of invention in view of the prior art. Parson discovered no new idea or principle. A serpentine rib is serpentine, and whether more or less so is a matter of degree or measure. It performs the same function in the same way, whether its sinuosities be greater or less.

It should be noted that the complainant for some years has been making and selling a grate-bar with two straight flanges, one on either side of the bar, for which a patent has been applied for. This procedure at once suggests the almost infinite possibilities of the rib of a grate-bar, or rather its location, as a field for invention. The opinion of the examiners in chief is not very satisfactory or convincing. They apparently concluded to give Mr. Parson the benefit of the doubt. It appears as if their judgment had been unduly affected by his use of the word "tangential" and other like technical terms. At all events, I find the testimony of the defendant's expert more satisfactory, wherein, after showing that the form and arrangement of the perforations in the Parson grate were very old, he says:

"The second element of the combination is a stiffening rib placed on the under side of the otherwise flat grate-bar. The effect of this is to stiffen the grate-bar after the manner familiar to the art, and in the way that all plates, slabs and strips of metal, have been stiffened from time immemorial. Such stiffening rib simply makes a T-bar of the cross-section. Iron having this cross-section, and thus stiffened, has long been used in innumerable ways. No novelty, of course, can be found thus far, either in the elements or their combination. The patentee, however, claims novelty because he has given longitudinal rib a 'serpentine shape' so that it will not block up the perforations. That is the whole of this so-called 'invention.' I say the whole of it, because the rest is mere verbiage incident to the zig-zag or serpentine shape of the rib. The placing of a stiffening rib along the middle of the under side of any bar, plate, or strip of iron is a mere commonplace, as much so as an ordinary brace or strut in carpentry. In cast-iron it is as easy to make a stiffening-

rib crooked as straight, and it surely required no inventive insight to see that with a perforated grate-bar (the holes being naturally staggered in accordance with common usages) a stiffening-rib along the middle, would avoid blocking the holes (especially if these are set closely together) by giving this rib a zigzag or serpentine shape."

In my judgment this patent is invalid. Upon the question of infringement, it is therefore unnecessary to say more than that it appears that the defendant installed a grate at the Ridgewood Pumping Station like the grate of the patent in suit, but for all that the case discloses it may have been one made by the complainant and properly used.

The bill of complaint will be dismissed, with costs.